NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IRIS GILLON AND IRIS GILLON MUSIC'N CELEBRATIONS, LLC D/B/A IGMC, | Hon. Dennis M. Cavanaugh |
| Plaintiffs, | **OPINION** |
| v. | Civil Action No. 2:12-cv-07558 (DMC) (JBC) |
| EU TING AND JUSTIN ZAMBUTO, | |
| Defendants. | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion by Defendants Eu Ting and Justin Zambuto ("Defendants") to dismiss the Amended Complaint of Plaintiffs Iris Gillon and Iris Gillon Music'n Celebrations, LLC, d/b/a IGMC ("Gillon," "IGMC," or collectively "Plaintiffs"), pursuant to FED. R. CIV. P. 12(b)(6). (Defs.' Mot. to Dismiss, Feb. 8, 2013, ECF No. 4). Pursuant to FED. R. CIV. P. 78, no oral argument was heard. Based on the following and for the reasons expressed herein, Defendants' Motion to Dismiss is **granted**.

I. **BACKGROUND**[1]

Gillon, through her event-planning company IGMC, worked with Defendants to arrange for a band to appear at Defendants' October 2011 wedding. After watching a performance by a lead female vocalist named Bedia, Defendants specifically sought to hire Bedia to perform at their

---

[1] The facts set forth in this Opinion are taken from the parties' respective moving papers.

1

wedding. (Defs.' Br. Supp. Mot. to Dismiss 3, Feb. 8, 2013, ECF No. 4). In September of 2010, Plaintiffs and Defendants signed a "Music Producer and Purchaser Agreement" in which IGMC agreed to provide the "Awestruck" band for Defendants' wedding and to "produce, supervise and manage all music administration" for the occasion. (Pls.' Am. Compl. Ex. A-2, Feb. 25, 2013, ECF No. 5). This agreement also included the following language:

> Purchasers have entered into this agreement relying on Bedia to perform as the lead female vocalist. Promptly upon receiving notice that Bedia is unable to perform at the event, IGMC and the Band shall notify Purchasers to enable Purchasers to audition a replacement, unless Bedia is stricken with a last minute illness or act of God preventing her from performing in which case Purchaser trusts the band AWESTRUCK to provide an equivalent rehearsed similar vocalist. (Am. Compl. Ex. A-2).

Despite assurances from Gillon leading up to the event, Bedia did not perform at Defendants' wedding. (Am. Comp. Ex. B-1, 12). According to Defendants, they were notified by a member of the band, not by Gillon, at the start of their wedding reception, that Bedia would not be performing and that she was not scheduled to perform that night because of her pregnancy. Id. Plaintiffs assert that this bandmember was misinformed, that Bedia was scheduled to perform that night, and that she became ill at the last minute. Id. at 29. Plaintiffs also claim they did not know about Bedia's illness or absence until after the wedding. Id. Defendants emailed Plaintiffs to express their general unhappiness with the band and particularly with the absence of both Bedia and the band manager they had been working with. Id. at 12. Thereafter, Plaintiffs and Defendants exchanged emails discussing potential settlement amounts Plaintiffs would pay Defendants to reimburse them for services not received under the contract and in exchange for refraining from filing suit and confidentiality. (Am. Comp. Ex. B-1).

On December 8, 2011, Defendants posted the following message on the website RipoffReport.com (the "Posting") expressing their dissatisfaction with Plaintiffs' services:

> Hi. Can you contact me if you are willing to? I got married in October and had a terrible

2

experience with Iris and IGMC. She lied to get us into a contract and then kept lying to keep us in it until the last payment...A total bait and switch of the lead vocalist (We had our heart set on the lead vocalist and made a contract around her and were, thanks to Iris, totally destroyed when she didn't show—we followed up about the lead vocalist up until the last payment and were told that the vocalist was good to go...all lies). It was definitely reckless disregard to ensure that she got to keep every cent from us, and I'm not about to let her get away with it (the band manager also wasn't present, so all of our instructions went down the drain)...among other things like cutting out a part of the cocktail hour to booze and subsequently curse at one of my wedding guests... Iris could not have cared less and won't own up to her own actions. I'm not asking for any sort of assistance or cooperation in a lawsuit that I plan on bringing, but I am just curious as to what happened in your case. (Am. Compl. Ex. C-4).

This Posting was entitled "similar experience" and posted in response to another negative review of Plaintiffs' services. After viewing this Posting, Plaintiffs sent Defendants a cease and desist letter dated January 3, 2012. The letter contained language demanding Defendants immediately

a) Cease and desist from writing any more libelous and defamatory statements on any public or private forum.
b) Cease and desist from making any further slanderous and defamatory oral statements in any public or private forum.
c) Provide me with prompt written assurance within ten days you will cease and desist from any further libelous, slanderous, and defamatory actions against me and desist from further threats against me and my company.
d) Post a retraction... (Am. Compl. Ex. A-5).

The letter also stated that "If this posting is not removed by Jan 30, 2012, I will commence legal action against both of you for damages to my reputation, libel, slander, damages to my finances... and for any and all other damages to my personal life that come from the defamatory and libelous nature of your posting." Id. This letter sparked further email discussions between Plaintiffs and Defendants. On January 15, 2012, Gillon emailed Defendants the following: "If I give you $3500, will you post the rebuttal that you suggested (For Rip-Off-Report.com) in your letter to me and promise to never post any more comments about me and my company again?" (Am. Compl. Ex. B-1, 37). Defendants agreed to these settlement terms which were ultimately memorialized in a settlement agreement dated January 31, 2012 ("Settlement Agreement"). The

3

Settlement Agreement included the following terms:

> IGMC will refund Ms. Eu Ting and Justin Zambuto $2000. That covers anything about the wedding which they were unsatisfied with. Ms. Ting will post a comment on RipOffReport that says: "I would like to take my posting down and am trying to do so. When Iris learned of our claims, she responded professionally and we were amicably able to resolve our differences." Ms. Eu Ting and Mr. Justin Zambuto will not post any more complaints or discuss their complaints with anyone else, except to make retractions. For this Ms. Gillon agrees to pay $1500. (Am. Compl. Ex. A-7).

The website RipoffReport.com will not take postings down from their site. Defendants therefore could not have the posting removed but did make this follow-up posting: "I previously posted Consumer Comment #1. I would like to take my posting down and am trying to do so. When Iris learned of our claims, she responded professionally and we were amicably able to resolve our differences." (Am. Compl. Ex. C-5).

On December 10, 2012, Plaintiffs brought the instant defamation action against Defendants. (Pls.' Compl., Dec. 10, 2012, ECF No. 1). Plaintiffs allege that the statements made by Defendants in the Posting were defamatory statements of fact and seek relief under the following causes of action: (1) Libel; (2) Libel Per Se; (3) Libel Innuendo; (4) Injurious Falsehood; (5) Defamatory Injury to Reputation; (6) False Light; (7) Unlawful Interference with Prospective Economic Advantage; (8) Contract Rescission based on Duress; (9) Product Disparagement; and a (10) Declaratory Judgment that the Posting is false and should be removed. (Am. Compl. 75-91). In response, Defendants filed this Motion to Dismiss on the basis that (1) all claims arising from the Posting are barred by the Settlement Agreement; (2) Plaintiffs did not enter the Settlement Agreement under duress; and (3) the content of the posting is not defamatory but constitutionally protected opinion. (Defs.' Br. 1).

## II. STANDARD OF REVIEW

In deciding a motion under Rule 12(b)(6), a district court is "required to accept as true all

factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [Plaintiff]." Phillips v. Cnty. of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a . . . motion to dismiss does not need detailed factual allegations." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). However, the Plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. (internal citations omitted). "[A court is] not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). Instead, assuming that the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above a speculative level." Twombly, 550 U.S. at 555.

A complaint will survive a motion to dismiss if it contains sufficient factual matter to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." Id. "Determining whether the allegations in a complaint are 'plausible' is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Young v. Speziale, Civ. No. 07-03129, 2009 WL 3806296, at *3 (D.N.J. Nov. 10, 2009) (quoting Iqbal, 556 U.S. at 679). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'shown'– that the pleader is entitled to relief." Iqbal, 556 U.S. at 679.

## II. DISCUSSION

### A. Settlement Agreement

The facts presented by Plaintiffs demonstrate that, after negotiations, Plaintiffs and

Defendants voluntarily entered into a Settlement Agreement to resolve their disputes over both Defendants' dissatisfaction with Plaintiffs' services and Plaintiffs' unhappiness with Defendants' Posting on RipoffReport.com. It is undisputed that after viewing the Posting, Plaintiffs sent a cease and desist letter to Defendants threatening to file suit for "libel, slander… and other damages…that come from the defamatory…posting" if Defendants did not immediately refrain from making further defamatory statements, remove the Posting, and post a retraction. (Am. Compl. Ex. A-5). The Settlement Agreement, drafted by Plaintiffs and executed by both parties, requires Defendants to post a follow-up comment on RipoffReport.com and to refrain from discussing any complaints about Plaintiffs. (Am. Compl. Ex. A-7). Thus, through the Settlement Agreement, Plaintiffs are receiving relief nearly identical to that sought in the cease and desist letter under the threat of a defamation lawsuit. The only reasonable inference to draw from these facts is that Defendants' promise to make a follow-up posting and maintain confidentiality is a negotiated term of the Settlement Agreement and serves as valid consideration for settlement of the dispute, i.e. for Plaintiffs' promise to refrain from bringing a lawsuit against Defendants for defamation or any other claims arising from the Posting.

The fact that there is no explicit release provision in the Settlement Agreement does not mean that Plaintiffs are free to bring claims against Defendants based on the Posting. The existence of the Settlement Agreement itself necessarily implies a mutual release of each parties' claims. See Laser Tech., Inc. v. Tyson, Civ. No. 99-1994, 2002 U.S. Dist. LEXIS 12261, at *19 n.17 (E.D. Pa. July 2, 2002) ("The settlement agreement necessarily implies a release of claims even though the 'Outline of Settlement' does not specifically state as much."); J.V. Distrib., Inc. v. Waber, Inc., Civ. No. 94-3053, 1995 U.S. Dist. LEXIS 12202, at *24 (E.D. Pa. Aug. 22, 1995) ("Where terms of a contract are otherwise sufficiently definite, the court may supply an omitted

term which is reasonably based on the contract as a whole."); Stacy v. Ametek, Inc., 562 N.E.2d 1180, 1182 (Ill. App. Ct. 1990) ("Thus, it is the existence of a settlement agreement that is important here, not the execution of a written release. Stacy's acceptance of the settlement agreement amounted to an implied release and would be an affirmative defense in any action to impose additional liability upon Dow.").

The Settlement Agreement unequivocally resolves and releases both parties from any claims arising from the Posting or from Defendants' dissatisfaction with Plaintiffs' services. A claim cannot survive a motion to dismiss where the Court can only infer that it is merely possible rather than plausible. Iqbal, 556 U.S. at 679. It is simply not plausible to believe that Defendants signed away their rights to sue Plaintiffs and agreed to maintain confidentiality and make a follow-up posting, but that Plaintiffs maintained their right to sue Defendants. As all of Plaintiffs' causes of action, with the exception of the eighth cause of action for duress, arise from the Posting, they are barred by the Settlement Agreement and must be dismissed.

**B. Duress**

Plaintiffs' eighth cause of action, for contract rescission based on duress, is without merit. Plaintiffs allege that Defendants "terrorized" them with "defamatory accusations while demanding cash in exchange for confidentiality." (Pls.' Opp. Br. 12, May 13, 2013, ECF No. 15). According to Plaintiffs, it was only under this state of duress, brought on by Defendants' threats of public attack, that Plaintiffs agreed to enter the Settlement Agreement. (Opp. Br. 12, 30). However, a reading of the emails and other communications leading up to the Settlement Agreement clearly shows that Plaintiffs' description of terrorizing threats and demands is an egregious mischaracterization of the exchange between the parties.

A settlement agreement between two parties is a binding legal contract that is to be

7

honored absent a demonstration of fraud or other compelling circumstances. See Nolan v. Lee Ho, 120 N.J. 465, 472 (1990). For a court to set aside a settlement agreement on grounds of duress, a plaintiff must demonstrate, by clear and convincing evidence, that the agreement was reached based on "coercion, deception, fraud, undue pressure, or unseemly conduct." Peskin v. Peskin, 639 A.2d. 849, 857 (N.J. Super. Ct. App. Div. 1983). A court will find duress if the level of constraint or danger, whether actual or threatened, is severe enough to "overcome the will of a person of ordinary firmness." Rubenstein v. Rubenstein, 20 N.J. 359, 365 (1956). This is a heavy burden of proof for a plaintiff to meet. See Cintron v. New Jersey, Civ. No. 10-195, 2011 Dist. LEXIS 111469, at *10 (D.N.J. Sept. 29, 2011).

Plaintiffs' argument for duress rests largely on the mischaracterization and out of context use of language extracted from Defendant Zambuto's email response to Plaintiffs' cease and desist letter. (Am. Comp. Ex. B-1, 36). For example, Plaintiffs misleadingly and incorrectly assert Defendants threatened to continue to make false public accusations about Plaintiffs with "rabid vigilance" in an attempt to destroy her business. (Opp. Br. 30). However, in the email, Defendant Zambuto only stated that he would respond to Plaintiffs' threats to sue for defamation using "facts and supporting documentation, and with rabid vigilance in civil court." (Am. Comp. Ex. B-1, 36) Plaintiffs also mischaracterize Defendants statement that he is within his "rights as a consumer" to communicate about his negative business experience with Plaintiffs "on websites, blogs, etc." as a threat to publish false defamatory statements about Plaintiffs. (Opp. Br. 29-30). These mischaracterizations of the exchange between the parties do not demonstrate that Defendants acted in a coercive manner or in a way that would "overcome the will of a person of ordinary firmness."

Other facts presented by Plaintiffs also fail to show any plausible acts of coercion or

undue pressure by Defendants. For example, Plaintiffs were represented by an attorney during early settlement discussions. (Defs.' Br. 13). In addition, it was Plaintiffs who ultimately drafted the Settlement Agreement and submitted it to Defendants with the subject line, "Sample Agreement - Simple. Fast. Clean. Is this okay with you?" and signed "Warmly, Iris." (Am. Comp. Ex. B-1, 38-9). Defendants responded with "Thank you for drafting this agreement" and accepted Plaintiffs' draft. Id. at 39. This exchange shows that by the time the Settlement Agreement was executed by the parties, their communications were relatively cordial and without any signs of coercion or duress. Overall, Plaintiffs' factual allegations are essentially no more than dramatic mischaracterizations of the facts and do not allow the Court to draw the reasonable inference that Plaintiffs entered the Settlement Agreement under duress. Therefore, Plaintiffs' eighth cause of action for duress must be dismissed.

### C. Defamation claims

As all of Plaintiffs' claims are dismissed as barred by the Settlement Agreement or for failure to demonstrate that Plaintiffs entered the Settlement Agreement under duress, the Court does not reach the issue of defamation or any of the defamation-related claims.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is **granted.** An appropriate Order accompanies this Opinion.

*[signature]*
Dennis M. Cavanaugh, U.S.D.J.

Date: September 20, 2013
Original: Clerk's Office
cc: Hon. James B. Clark, U.S.M.J.
All Counsel of Record
File